# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| WENDELL SNIDER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 1:08-CV-53 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Wendell Snider appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Snider applied for DIB on June 22, 2000, alleging that he became disabled as of November 1, 1999. (Tr. 495-97.) The Commissioner denied his application initially and upon reconsideration. (Tr. 478-79, 481-85.) A hearing was conducted on May 17, 2002, and the Administrative Law Judge ("ALJ") rendered an unfavorable decision on June 27, 2002. (*See* Tr. 15, 452-65.) Snider filed a new DIB claim on May 2, 2003, which was also denied initially and on reconsideration. (Tr. 28-29, 96-98.) ALJ Frederick McGrath held a hearing on September 7,

---
[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

2004, at which Snider, who was represented by counsel, and a vocational expert ("VE") testified. (Tr. 920-74.) The ALJ rendered an unfavorable decision on that claim on February 28, 2005. (Tr. 50A-58.) Snider requested a review of this hearing decision, and the Appeals Council remanded the case for a further hearing. (Tr. 30-33.) The new and former claims were joined on remand (Tr. 33), and ALJ McGrath held a third hearing on July 5, 2006, at which Snider was represented by counsel and again testified. (Tr. 904-19.) On August 24, 2007, the ALJ rendered another unfavorable decision. (Tr. 15-24.) Snider submitted a request for review to the Appeals Council, which the Appeals Council denied (Tr. 8-10), making the ALJ's decision the final decision of the Commissioner.

Snider filed a complaint with this Court on February 14, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.) He argues that the ALJ improperly evaluated the opinion of treating physician, Dr. Suseela Doravari; the opinion of examining physician, Dr. H.M. Bacchus;[2] the credibility of his symptom testimony regarding his physical symptoms; and that the ALJ's residual functional capacity ("RFC") was inconsistent with the state agency physicians' opinions upon which he relied to make his RFC finding. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 15, 17-18; Reply Br. 2.)

---

[2] Although Snider in his Opening Brief labeled the opinion in question as treating physician Dr. Thomas Lazoff's, he corrected his argument in his reply brief, clarifying that he challenged the ALJ's decision to give Dr. Bacchus's opinion (that Snider is only able to work four hours per day) less weight.

## II. FACTUAL BACKGROUND[3]

### A. *General Background*

Snider was forty years old at the time of the alleged onset date. (Tr. 96.) He had a General Equivalency Degree. (Tr. 141.) The record reflects that Snider had served in the United States Army from 1976 to 1979 in Airborne telecommunications, during which time he was injured in a jeep accident, sustaining numerous injuries. (Tr. 551.) Subsequent to his military service, he was self-employed for about eighteen years painting houses. (Tr. 136.)

Snider alleged impairments including degenerative disc disease in the cervical, thoracic, and lumbar spine; thoracic stenosis; compression fractures in the thoracic and lumbar spines; lumbar disc protrusions; lumbar radiculopathy; right shoulder impingement syndrome with overlying myofascial pain syndrome; right upper extremity sensory impairment over hands and fingers; carpal tunnel syndrome; peripheral neuropathy; fibromyalgia; sleep apnea; head injury with personality changes; cognitive disorder, NOS; and dysthymic disorder. (Opening Br. 2.) He wrote in his adult disability report that he stopped working because he "can't use body, get[s] weak and dizzy, ha[s] seizures, terrible headaches, need[s] to sleep periodically during day to ease pain." (Tr. 135.)

### B. *Summary of Snider's Testimony at the July 5, 2006, Hearing*

Snider testified that he was in a military accident years ago resulting in spinal fractures, nerve damage, a hip fracture, and head injuries. (Tr. 911.) He stated that he was "on the streets" for about four years after he got out of the service, and then later got married and started up a

---

[3] The administrative record in this case is voluminous, and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision. For example, evidence of Snider's alleged mental impairments has been omitted for this reason.

3

painting company. (Tr. 911.) Snider also alleged disc protrusions in his neck, arm and shoulder problems, ganglion cysts and carpal tunnel syndrome in his wrists and hands, headaches, rectal pain, and chest and back pain. (Tr. 912-13.) He further testified to having seizures (Tr. 910, 914) as well as sleep apnea requiring the use of a C-Pap (Tr. 918). He also stated that he has leg and foot problems (Tr. 913), and that certain neck movements cause pain and affect his ability to use his left arm (Tr. 912).

Snider testified that he takes about fifteen prescriptions, including morphine and Darvocet, and that without pain medicine his pain is a ten on a ten point scale, but goes down to a four with medication. (Tr. 913-14.) He mentioned that the morphine makes him "flakey" and causes him to have trouble with others. (Tr. 914-15.)

Snider explained that he last worked in 1998 or 1999, and stopped after he had a seizure on a ladder and fell into some bushes. (Tr. 910.) He testified that he cooks and cleans some, and goes shopping with his wife. (Tr. 910.) He also explained that some days he sits by a pond and fishes with his son, or goes with his wife while she takes care of her business. (Tr. 915-16.)

*C. Summary of the Relevant Medical Evidence*

After a sleep study in 1997, Snider was diagnosed with obstructive sleep apnea, hypoxemia, and snoring. (Tr. 547-48.)

A June 1998 MRI of the cervical and thoracic spine showed a small protrusion at T1-2 (without stenosis or narrowing) and mild degenerative changes. (Tr. 557-58.) About a month later, in July 1998, Dr. Will Ungemach performed a Compensation and Pension exam for the Veterans Administration ("VA") regarding his spinal problems. (Tr. 554-56.) His diagnosis was status post compression fracture T12, well-healed, non-symptomatic, and cervical and

4

T1-T2 disc bulging without herniation with localized arthritis. (Tr. 555.)

In August 1998, Snider saw Dr. Thomas Lazoff for a long-standing history of neck and back pain resulting from his injury from the jeep accident in the service. (Tr. 853.) Dr. Lazoff diagnosed a cervical herniated disc at C5-6 with right C6 radiculopathy; degenerative disc disease of the cervical, thoracic, and lumbosacral spine; spondylosis of the cervical and thoracic spine; superimposed myofascial pain syndrome; old T11-12 and L1 compression fractures; history of traumatic brain injuries; and history of sleep apnea. (Tr. 855.) Dr. Lazoff doubted that Snider would ever be free of pain, but endeavored to reduce the symptoms. (Tr. 855.) He recommended physical therapy, a home exercise program, medication, possible epidurals and EEG testing, and follow-up. (Tr. 855-56.) In September, Snider reported to Dr. Lazoff that he was feeling somewhat better overall but still experienced extremity pain. (Tr. 837.)

In January 1999, the VA determined that Snider was 20% disabled due to a compression fracture of the T-12 vertebrae. (Tr. 175-76.) That May, the VA also determined that Snider was 20% disabled due to a herniated cervical disc with right C6 radiculopathy, which was granted for "recurring attacks of moderate intervertebral disc syndrome." (Tr. 177.)

A July 1999 MRI of the lumbar spine showed probable post-traumatic changes at the T12-L1 interspace with endplate irregularity and osteophyte formation, focal inferior foraminal metal disc protrusion on the right at L3-4, and L4-5 disc bulge with mild facet degenerative changes at L4-5 and L5-S1. (Tr. 569-70.)

Snider visited Dr. Lazoff again in July 1999 for low back pain. (Tr. 824.) Dr. Lazoff diagnosed lumbosacral strain with a component of both facet arthropathy/syndrome and probable L3-4 radiculopathy intermittently. (Tr. 825.) Snider returned to him in April 2000 for arm pain

5

after he had been painting at a site. (Tr. 821.) After reviewing an MRI, the doctor diagnosed mild right shoulder impingement syndrome and overlying myofascial pain syndrome and recommended physical therapy. (Tr. 821.) He was seen again in April 2000 for a follow-up of his shoulder, and he also had some low back pain and intermittent calf pain which occurred after walking a fair distance. (Tr. 819.) Snider underwent a shoulder injection. (Tr. 819.)

Also in April 2000, the VA found that Snider was 20% disabled as a result of lower back disability with degenerative changes, and that he had a combined evaluation of 90% (including a prior determination of 60% disability for head injury). (Tr. 180-83.) The 20% rating was based on Snider's moderate limitation of movement. (Tr. 180, 182.)

In September 2000, Venkata Kancherla, M.D., performed a consultative physical exam. (Tr. 778.) Dr. Kancherla's findings were limited mobility of the right shoulder; right upper extremity sensory impairment over hands and fingers overlying dermatomes C6, C7, and C8 and positive radiculopathy; restricted cervical spine mobility; history of compression fractures of the thoracic and lumbar vertebra; mild tenderness over the lumbrosacral spine with a positive straight leg raising test without any neuropathy; and mild sensory impairment over the right lower extremity overlying dermatomes L4 and L5. (Tr. 780.)

In November 2000, Dr. L. Bastnagel, non-examining state agency physician, determined that Snider could perform work involving lifting fifty pounds occasionally and twenty-five pounds frequently; standing or walking for about six hours in an eight-hour workday; sitting for about six hours in an eight-hour workday; occasional climbing, balancing, and crouching; frequent balancing, stooping, kneeling, crouching, and crawling; limited reaching; and that he should avoid concentrated exposure to heights. (Tr. 798-805.) Another state agency physician

6

reviewed and affirmed this opinion in June 2001.  (Tr. 805.)

Dr. H.M. Bacchus performed a consultative physical exam in April 2001.  (Tr. 806-09.) He reported that Snider's gait was slightly antalgic; that he had range of motion deficits in the neck, lower back, shoulders, hips, and knees; and that his muscle strength, tone, and grip strength were 4/5.  (Tr. 807.)  Dr. Bacchus opined that Snider had the functional capacity to do part-time light duties at four hours per day; handle up to ten pounds; and that he should not have to concentrate, interact socially, and adapt.  (Tr. 808.)

Snider visited the Fort Wayne VA at least three times in June through September 2001 for treatment of pain in his right extremity, neck, and back.  (Tr. 862-68.)  Also that September, Dr. Lazoff performed an EMG which indicated carpal tunnel syndrome, evidence to suggest early peripheral polyneuropathy, and old S1 radiculopathy.  (Tr. 195.)  October 2001 x-rays showed very small disc bulges in the lower back and mild loss of disc height with minimal bulging and mild foraminal narrowing in the neck.  (Tr. 861-63.)

On November 18, 2001, Dr. Lazoff provided a medical statement to Snider's counsel. (Tr. 880-81.)  In his opinion, Snider was unable to perform substantial manual labor given his diagnoses and was extremely limited due to his overall pain complaints.  (Tr. 880.)  The diagnoses were significant degenerative disc disease in the cervical, thoracic, and lumbosacral spine; spondylosis of the cervical and thoracic spine; a history of prior compression fractures; chronic right S1 radiculopathy; moderate bilateral carpal tunnel syndrome; early peripheral polyneuropathy which was primarily sensory; and a history of head injury.  (Tr. 880.)

On March 15, 2002, Snider visited Dr. Suseela Doravari at the Fort Wayne VA for worsening back and joint pain.  (Tr. 891.)  The diagnosis was chronic pain with degenerative

7

arthritis and disc bulging, and his OxyContin prescription was adjusted. (Tr. 891.) The doctor noted that Snider had a history of seizure disorder and appeared to have some complex partial seizures. (Tr. 891.)

Snider visited the VA pain clinic at least six times throughout the remainder of 2002 for pain management, receiving numerous injections for back and joint pain and nerve blocks for headaches. (Tr. 282, 286-88, 300-02, 303-04, 311-12, 316-20.) In October 2002, he reported continued pain relief following the nerve blocks and reported almost 100 percent pain relief from his current dose of OxyContin. (Tr. 286-87.) The diagnosis was fibromyalgia, peripheral neuropathy, and occipital neuralgias. (Tr. 288.)

Snider visited the Fort Wayne VA clinic as well as the pain clinic at least six times from February through August 2003. (Tr. 230-61.) On February 29, 2003, the VA clinic authorized a wheelchair for his use after Snider complained that he gets tired walking around the mall. (Tr. 256.) He also received a epidural steroid injection in March 2003 for back pain. (Tr. 247-49.)

Snider had a Compensation and Pension Exam in June 2003. (Tr. 357-65.) Dr. Victor Levine found that Snider's generalized pain could mostly be explained by severe changes with his cervical, thoracic and lumbar spine with sciatica and radiation pain from the cervical spine to shoulders. (Tr. 358.) Dr. Levine opined that Snider's condition had gradually worsened and that he had "significant functional impairment" that interferes with his daily activities and ability to work, and that he was "totally and permanently disabled." (Tr. 361.) Snider was also examined by Dr. Christopher Rocco for neurological disorders. (Tr. 362-65.) He found post-traumatic migraine secondary to trauma that occurred in 1978, post-traumatic myelopathy with history of compression fracture at T12 with result of cervical herniated nucleus pulposus

8

and residual head injuries, and degenerative changes in the lumbar spine. (Tr. 363-65.)

In June 2003, Snider saw Dr. Venkata Kancherla for a consultative physical exam at the request of Social Security. (Tr. 211-13.) He arrived in a wheelchair but was able to walk into the examination without any assistance or devices, and he could dress and undress and get on and off the examination table without assistance. (Tr. 212.) Dr. Kancherla found no deformity or tenderness over the lumbar sacral spine; positive straight leg raising test bilaterally with spasm of paraspinal muscles; reduced dorsiflexion, extension, and lateral rotation of the lumbar spine with radiculopathy; no neuropathy of the lower extremities; limited right shoulder range of motion; and a history of hypertension. (Tr. 212-13.)

Later in June, Dr. V. Bastnagel, non-examining State Agency doctor, found that Snider could lift and carry up to twenty pounds occasionally and up to ten pounds frequently; stand and/or walk for about two hours in an eight-hour workday; only occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl; never climb ladders, ropes, or scaffolds; and needed to avoid all exposure to hazards such as machinery and heights. (Tr. 221-27.) Another state agency physician later affirmed this opinion. (Tr. 227.)

In July 2003, the VA issued a Rating Decision that Snider was 50% disabled on account of a cranial nerve disorder with migraine headache; 10% disabled due to radiculopathy in his right leg, consistent with mild symptoms; 10% disabled as a result of radiculopathy in his left leg, consistent with mild symptoms; 20% disabled due to a herniated disc in the neck with right C6 radiculopathy; 20% disabled due to a fractured verterbrae; and 20% disabled on account of lower back disability with degenerative changes. (Tr. 101-06.) Snider's combined rating, determined by use of a rating table, was 100%. (Tr. 447-48.)

9

Snider visited Dr. Doravari in September 2003 for continued back pain radiating to both legs, neck pain radiating to both arms, and head pain; his medications were adjusted. (Tr. 353-54.) On September 18, 2003, a physical therapist issued him a wheeled walker with a seat. (Tr. 381.) Later that month, he went to the VA emergency room for a seizure; a CT scan of the brain was largely normal. (Tr. 348-51, 369.) He then visited the Fort Wayne VA again in October 2003 for problems with his C-Pap machine and medications. (Tr. 404, 413.) Snider both called and visited the Fort Wayne VA clinic numerous times from October 2003 through July 2004 regarding various complaints, including back and shoulder pain and medication problems, seeing Dr. Doravari approximately four times in that time period. (*See, e.g.,* Tr. 385-86, 389, 400, 401, 406, 421-28.)

On September 2, 2004, Dr. Doravari completed a Medical Source Statement. (Tr. 442-46.) She wrote that the length of her contact with Snider was ten years, and that he has chronic back, neck, and right shoulder pain. (Tr. 442.) She affirmed that emotional factors contribute to the severity of Snider's symptoms and functional limitations, and that his pain is severe enough to often interfere with attention and concentration. (Tr. 442.) Dr. Doravari estimated that Snider would miss about two days of work per month due to his impairments. (Tr. 445.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind

10

might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

11

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

The ALJ rendered his decision on August 24, 2006. (Tr. 15-24.) At step one of the five step analysis, he found that Snider had not engaged in any substantial gainful activity from his alleged onset date through the date last insured. (Tr. 17.) At step two, he found that Snider had severe impairments of epilepsy, migraines, right shoulder problems, and arthritis, but no severe mental impairments. (Tr. 17.) At step three, the ALJ determined that Snider did not have an impairment or combination of impairments that meet or equal a listing. (Tr. 19.) Before proceeding to step four, the ALJ found that, through his date last insured, Snider "had the [RFC] to perform light work that did not involve working around unprotected heights or dangerous machinery or any climbing of ladders, ropes, or scaffolds. He was able to lift and carry twenty pounds occasionally and ten pounds frequently. In an eight-hour period, the claimant was able

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC, or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

to sit or stand/walk for a total of six hours each." (Tr. 19.)

Based on this RFC and the VE's testimony, the ALJ found at step four that Snider was unable to perform his past relevant work as a painter. (Tr. 22.) However, he found at step five that through the date last insured, a significant number of jobs existed in the national economy for someone with his age, education, work experience, and RFC, such as shipping/receiving weigher, electronics tool assembler, electrical equipment subassembler, information clerk, office helper, parking lot attendant, or wire machine tender. (Tr. 24.) He further determined that a significant number of jobs existed even if Snider was limited to sedentary work with the same nonexertional limitations, such as printed circuit layoff taper, charge account clerk, microfilm document preparer, surveillance system monitor, film touch-up inspector, or touch-up screener. (Tr. 23.) Therefore, Snider's claims for DIB were denied. (Tr. 25.)

### C. The ALJ Erred by Failing to Evaluate the Opinion of Dr. Doravari, Snider's Treating Physician.

In denying Snider DIB, the ALJ failed to consider the opinion of Dr. Doravari, one of Snider's treating physicians. As Snider correctly asserts, the ALJ's omission is an error necessitating a remand.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir.

2002).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to DIB simply because her treating physician states that she is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner, *id*.; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1). Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).

Although an ALJ may discount a treating physician's opinion if it is not well-supported or is inconsistent with other substantial evidence, as long as he minimally articulates his reasons for doing so, *Skarbek v. Barnhart,* 390 F.3d 500, 503-04 (7th Cir. 2004), in this instance the ALJ failed to mention, much less discuss, Dr. Doravari's opinion penned on September 2, 2004. Dr. Doravari concluded that Snider has chronic back, neck, and right shoulder pain; that emotional factors contribute to the severity of Snider's symptoms and functional limitations; that his pain is

14

severe enough to often interfere with attention and concentration; and that Snider would likely be absent about two days per month as a result of his impairments. (Tr. 442-45.)

The ALJ's failure to address Dr. Doravari's opinion constitutes reversible error. *See* 20 C.F.R. § 404.1527(d) ("[W]e will evaluate every medical opinion we receive."); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (opining that when probative evidence is left unmentioned by the ALJ, the court is left to wonder whether it was even considered); *Golembiwski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (emphasizing that an ALJ must not ignore evidence which contradicts his opinion, but must evaluate the record fairly); *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) (stating that the ALJ's failure to mention a physician's report prohibits the court from evaluating "whether the ALJ properly rejected this evidence in favor of the other doctors' reports, or even [from ensuring] that the ALJ examined th[e] report, unless the ALJ explains his reasoning"); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (stating that "the ALJ's decision must be based upon consideration of all the relevant evidence and that the ALJ must articulate at some minimal level his analysis of the evidence") (internal quotation marks omitted); *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1059 (E.D. Wis. 2005) ("Given their prominence in social security proceedings, it is difficult to see how ignoring a treating source report can ever be reasonable.").

The Commissioner argues that the ALJ did not commit reversible error when he failed to discuss Dr. Doravari's opinion, because the ALJ would have determined that the opinion is

inconsistent with other evidence, such as the diagnostic test results and the opinions of the state agency physicians. (Resp. Br. 16-17.) This argument is unavailing. "The first problem with [the Commissioner's] argument is that the ALJ did not make it. 'Principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine [judicial] review to the reasons supplied by the ALJ.'" *Blom*, 363 F. Supp. 2d at 1059 (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)); *see also Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) (emphasizing that unless the ALJ sufficiently articulates his reasoning, the reviewing court cannot tell if the ALJ rejected probative evidence or simply ignored it); *Wates v. Barnhart*, 288 F. Supp. 2d 947, 950 (E.D. Wis. 2003) (emphasizing that in reviewing an ALJ's decision, the court is confined to the reasons the ALJ provided and cannot supply its own reasons or rely on the Commissioner's *post hoc* rationalizations).

Furthermore, even if the Commissioner's argument was not *post hoc*, it would still fail. Contrary to the Commissioner's assertion that Dr. Doravari's opinion is "dramatically inconsistent with a considerable amount of evidence" (Resp. Br. 16), it is not obviously inconsistent with the statements of at least three physicians, including Dr. Bacchus's opinion that Snider had the capacity for working only four hours per day, Dr. Lazoff's opinion that Snider was unable to perform substantial manual labor and was extremely limited due to his overall pain complaints, as well as Dr. Levine's statement that Snider was permanently and totally disabled. Moreover, the last VE to testify in Snider's DIB hearings stated that competitive employment was not possible if Snider missed more than one day of work per month. (Tr. 973-74.) Thus, it is by no means clear that the ALJ's oversight was harmless error. *Cf. Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to

16

remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). As a result, the Commissioner's *post hoc* argument attempting to rehabilitate the ALJ's fault falls short.

Accordingly, the Commissioner's final decision will be remanded so that the ALJ may properly consider the medical source opinions of record in accordance with 20 C.F.R. § 404.1527 and adequately articulate his analysis of this evidence.[5]

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion. The Clerk is directed to enter a judgment in favor of Snider and against the Commissioner.

SO ORDERED.

Enter for this 8th day of January, 2009.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge

---

[5] Snider points out that although the ALJ limited him to light work with some restrictions, the state agency physicians who he relied on in forming his RFC determination last opined that Snider could stand and/or walk only for about two hours in an eight-hour workday. Snider concedes that this discrepancy is harmless, since even if restricted to sedentary work, the Medical Vocational Guidelines would direct a finding of not disabled. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 1. Nevertheless, Snider requests that this discrepancy be clarified. Because this case is already being remanded on other grounds, the Court recommends that the ALJ address any discrepancy between his RFC finding and the medical opinions upon which he relied.

Furthermore, because a remand is warranted on the arguments discussed herein, we do not need to reach Snider's remaining arguments.